MARK J. BOURASSA, ESQ. (NBN 7999)
JENNIFER A. FORNETTI, ESQ. (NBN 7644)
VALERIE S. GRAY, ESQ. (NBN 14716)
**THE BOURASSA LAW GROUP**
2350 W. Charleston Blvd., Suite 100
Las Vegas, Nevada 89102
Telephone:   (702) 851-2180
Facsimile:    (702) 851-2189
Email:        *mbourassa@blgwins.com*
              *jfornetti@blgwins.com*
              *vgray@blgwins.com*


GARY F. LYNCH (*pro hac vice forthcoming*)
JAMISEN A. ETZEL (*pro hac vice forthcoming*)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 322-9243
Email:        *gary@lcllp.com*
              *jamisen@lcllp.com*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
***

| | |
|---|---|
| HUDA ABDALJALIL, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PERRY JOHNSON & ASSOCIATES, INC. d/b/a PJ&A, | |
| Defendant. | |

     Plaintiff Huda Abdaljalil ("Plaintiff") brings this Class Action Complaint, on behalf of herself and all others similarly situated, against Defendant Perry Johnson & Associates, Inc. d/b/a PJ&A ("PJ&A" or "Defendant"), alleging as follows based upon information and belief and investigation of

-1-

counsel, except as to the allegations specifically pertaining to herself, which are based on personal knowledge:

## NATURE OF THE ACTION

1.     Companies that handle sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2.     The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

3.     PJ&A is a medical transcription service provider which takes dictations about their healthcare provider clients' patients and transcribes them into clinical documented reports.[1]

4.     As a healthcare business associate, PJ&A knowingly obtains, collects, and stores patient PII and PHI. In turn, PJ&A has a duty to secure, maintain, protect, and safeguard the PII and PHI that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

5.     Despite PJ&A's duty to safeguard patients' PII and PHI, Plaintiff's and other patients' PII and/or PHI was accessed and exfiltrated by a threat actor during a data breach of Defendant's computer network which occurred between March 27, 2023, and May 2, 2023 (the "Data Breach").[2]

---

[1] *Medical Transcription*, PJ&A, available at: https://www.pjats.com/portfolio/medical-transcription/ (last accessed Dec. 11, 2023).
[2] *Cyber Incident Notice*, PJ&A, available at: https://www.pjats.com/downloads/Notice.pdf (last accessed Dec. 11, 2023).

6.    Despite the Data Breach occurring between March 27, 2023 and May 2, 2023, PJ&A inexcusably waited nearly six months until, on or about October 31, 2023, to begin notifying impacted individuals of the Data Breach

7.    Based on the public statements of PJ&A to date, a wide variety of patient PII and PHI was implicated in the Data Breach, including but not limited to patient names, dates of birth, addresses, medical record numbers, hospital account numbers, admission diagnoses, and dates and times of services, Social Security numbers, insurance information, and information from medical transcription files, such as laboratory and diagnostic testing results, medications, the names of the treatment facilities, and the names of the healthcare providers.[3]

8.    The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patient PII and/or PHI. Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard patient PII and/or PHI; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to monitor and timely detect the Data Breach.

9.    As a result of Defendant's failure to implement and follow basic data security procedures, Plaintiff's and Class Members' PII and PHI is now in the hands of cybercriminals who wish to use it for nefarious purposes.

10.    As a result of PJ&A's inadequate data security and a breach of its duties and obligations, Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion on their health privacy, and similar forms of criminal mischief, risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

11.    Plaintiff, on behalf of herself and all others similarly situated, alleges claims for negligence, unjust enrichment, and declaratory judgment, and seeks to compel Defendant to adopt

---

[3] *Id.*

reasonably sufficient security practices to safeguard patient PII and PHI that remains in its custody in order to prevent incidents like the Data Breach from reoccurring in the future and to further provide Plaintiff and Class Members with credit monitoring services for the rest of their lives.

12.    To recover from Defendant for these harms, Plaintiff and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendant to: (1) disclose, expeditiously, the full nature of the Data Breach and the types of PII and PHI accessed, obtained, or exposed by the hackers; (2) implement improved data security practices to reasonably guard against future breaches of PII and PHI possessed by Defendant; and (3) provide, at its own expense, all impacted victims with lifetime identity protection services.

## PARTIES

13.    Plaintiff is and, at all relevant times hereto, an adult who is resident of the State of Ohio. Plaintiff received a notification from Defendant indicating that her PII and/or PHI in PJ&A's possession had been compromised during the Data Breach.

14.    Defendant PJ&A is, and at all relevant times hereto, a Nevada corporation with a principal place of business located in Henderson, Nevada. Defendant PJ&A is a citizen of Nevada.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

16.    This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District, and Defendant resides in this District.

17.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

**FACTUAL BACKGROUND**

**PJ&A Collected and Stored Plaintiff's and Class Members' PII and PHI.**

18.     PJ&A is the largest privately held transcription company in the United States and has been since 2015.[4] To provide its medical transcription services, Defendant is entrusted with clinical dictations from its healthcare provider clients, and PJ&A then uses those dictations to transcribe clinical documented reports.[5]

19.     In the regular course of its business, PJ&A collects and maintains the PII and PHI of patients and former patients through its healthcare provider clients to whom it is currently providing or previously provided its health-related transcription services.

20.     As a regular part of its business, PJ&A requires patients to provide personal information to its healthcare provier clients before it provides its transcription services. This information includes: patient names, dates of birth, addresses, medical record numbers, hospital account numbers, admission diagnoses, and dates and times of services, Social Security numbers, insurance information, and information from medical transcription files, such as laboratory and diagnostic testing results, medications, the names of the treatment facilities, and the names of the healthcare providers.

21.     As a Health Insurance Portability and Accountability Act ("HIPAA") covered entity, PJ&A is required to implement adequate safeguards to prevent unauthorized use or disclosure of PHI, including by implementing requirements of the HIPAA Security Rule[6] and to report any unauthorized use or disclosure of PHI, including incidents that constitute breaches of unsecured PHI as in the case of the Data Breach complained of herein.

22.     Indeed, PJ&A even touts that its transcription services are "HIPAA Complaint."[7]

---

[4] *PJ&A Announces Data Breach Affecting the Information of 8,952,212 Consumers*, JD SUPRA, available at: https://www.jdsupra.com/legalnews/pj-a-announces-data-breach-affecting-5757437/ (last accessed Dec. 11, 2023).

[5] *Medical Transcription*, *supra* note 1.

[6] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[7] *Medical Transcription*, *supra* note 1.

23.    Even though PJ&A "is committed to protecting the privacy and security of the information [they] maintain,"[8] PJ&A nevertheless employed inadequate data security measures to protect and secure the patient PII and entrusted to it, and it waited nearly six months to disclose the Data Breach to impacted individuals.

24.    Plaintiff and Class members are, or were, patients of PJ&A's healthcare provider clients and entrusted PJ&A with their PII and PHI. When providing their PII and PHI, Plaintiff and Class Members reasonably expected that PJ&A would safeguard their PII and PHI, and keep their sensitive information confidential.

**PJ&A is a HIPAA Covered Business Associate**

25.    PJ&A is a HIPAA covered business associate that provides services to various healthcare providers (*i.e.*, HIPAA "Covered Entities"). As a regular and necessary part of its business, PJ&A collects and custodies the highly sensitive PHI of its clients' patients. PJ&A is required under federal law to maintain the strictest confidentiality of the patients' PHI that it acquires, receives, and collects, and PJ&A is further required to maintain sufficient safeguards to protect that PHI from being accessed by unauthorized third parties.

26.    As a HIPAA covered business associate, PJ&A is required to enter into contracts with its Covered Entities to ensure that it will implement adequate safeguards to prevent unauthorized use or disclosure of PHI, including by implementing requirements of the HIPAA Security Rule and to report to the Covered Entities any unauthorized use or disclosure of PHI, including incidents that constitute breaches of unsecured PHI as in the case of the Data Breach complained of herein.

27.    As a condition of receiving PJ&A's services, Defendant requires that Covered Entities and their patients, including Plaintiff and Class Members, entrust it with highly sensitive personal information. Due to the nature of PJ&A's business, which includes medical transcription services, Defendant would be unable to engage in its regular business activities without collecting and aggregating PHI that it knows and understands to be sensitive and confidential.

---

[8] *Cyber Incident Notice*, *supra* note 2.

28.     Indeed PJ&A "recognizes the importance of information security" and further touts that its "platform enables HIPAA compliance through advanced technology for dictation, transcription and patient data accessibility," explaining that it employs certain "fundamental principles" [9]

29.     Plaintiff and Class members are or were patients whose PHI was maintained by or who received health-related services though PJ&A through its healthcare provider clients, and directly or indirectly entrusted PJ&A with their PHI. Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**PJ&A Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Harm to Victims.**

30.     PJ&A was well aware that the PII and PHI it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

31.     PJ&A also knew that a breach of its computer systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

32.     These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and other healthcare partner and provider companies, including Managed Care of North America, OneTouchPoint, Inc., Shields Healthcare Group, Eye Care Leaders and Connexin Software, Inc., and Blackbaud.

33.     PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[10] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

34.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and

---

[9] *HIPAA Compliancy*, PJ&A, https://www.pjats.com/hipaa-compliancy/ (last accessed Dec. 11, 2023).
[10]   Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed Dec. 11, 2023).

1
2
government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[11]

3
4
5
35.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[12]

6
7
8
9
10
11
12
36.    The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[13] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[14]

13
14
15
16
17
37.    Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure of the information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[15]

18
19
20
21
22
23
24
25
26
27
28

---

[11]    *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/ (last accessed Dec. 11, 2023).

[12]    *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last accessed Dec. 11, 2023).

[13]    *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Dec. 11, 2023).

[14]    Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names (last accessed Dec, 11, 2023).

[15]    *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last accessed Dec. 11, 2023).

38.     Further, the rate of healthcare data breaches has been on the rise in recent years. "In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[16]

39.     In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[17]

40.     The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[18]

41.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves PJ&A's patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

42.     **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

43.     The Social Security Administration even warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

---

[16] *Id.*

[17] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last accessed Dec. 11, 2023).

[18] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last accessed Dec. 11, 2023).

Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[19]

44.    Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

45.    **Medical Information**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[20] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[21]

---

[19] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Dec. 11, 2023).

[20] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last accessed Dec. 11, 2023).

[21] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-

46.    Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[22]

47.    "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[23]

48.    According to Experian:

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage, or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[24]

---

services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last accessed Dec. 11, 2023).

[22] Alder, *supra* note 14.

[23] *Id.*

[24] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed Dec. 11, 2023).

49.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[25]

50.     **Health Insurance Information**—"stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[26]

51.     Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

52.     Based on the value of the PII and PHI of its healthcare provider clients' patients to cybercriminals, PJ&A knew or should have known, the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were breached. PJ&A failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**PJ&A Breached its Duty to Protect Patient PII and PHI.**

53.     On or about October 31, 2023, Defendant announced that it had suffered a data security incident and began sending notice to impacted patients.[27]

---

[25] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last accessed Dec. 11, 2023).

[26] Kate O'Flaherty, *Why cyber-Criminals Are Attacking Healthcare -- And How to Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69 (last accessed Dec. 11, 2023).

[27] *Cyber Incident Notice*, *supra* note 2.

54.    According to PJ&A, between March 27, 2023 and May 2, 2023, an unauthorized party gained access to Defendant's computer network. During that time, the unauthorized party was able to gain access to and acquire copies of files stored on PJ&A's computer network.[28]

55.    Following an investigation into the Data breach, PJ&A determined that the unauthorized party was able to gain access to and steal patients' PII and PHI, including names, dates of birth, addresses, medical record numbers, hospital account numbers, admission diagnoses, and dates and times of services, Social Security numbers, insurance information, and information from medical transcription files, such as laboratory and diagnostic testing results, medications, the names of the treatment facilities, and the names of the healthcare providers.[29]

56.    Based on PJ&A's notice sent to impacted patients, it is unclear when Defendant became aware of the Data Breach; when it began an investigation into the Data Breach; when PJ&A took action to stop the Data Breach; and whether the Data Breach has actually been stopped.

57.    It is evident that the unauthorized actor accessed PJ&A's computer network in an attack designed to acquire sensitive, confidential, and valuable PII and PHI stored therein, and that they were successful in the attack. Based on Defendant's disclosures, the PII and PHI stolen by cybercriminals was not encrypted.

58.    On or about November 3, 2023, PJ&A reported the Data Breach to United States Department of Health and Human Services Office for Civil Rights ("HHS"), indicating that the Data Breach impacted approximately 8.9 million individuals.[30] The Data Breach is the second largest in size according to HHS's breach portal, which dates back to 2020.[31]

59.    On or about the same time, PJ&A began notifying impacted patients of the Data Breach. But despite the Data Breach occurring between March 27, 2023 and May 2, 2023, Defendant

---

[28] *Id.*

[29] *Cases Currently Under Investigation*, US DHHS OCR, available at: https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Dec. 11, 2023).

[30] *Id.*

[31] Zach Whittaker, *9 Million patients had data stolen after US medical transcription firm hacked*, TechCrunch (Nov. 15, 2023), https://techcrunch.com/2023/11/15/9-million-patients-had-data-stolen-after-us-medical-transcription-firm-hacked/ (last accessed Dec. 11, 2023).

inexcusably waited nearly six months to notify impacted patients that their PII and PHI had been compromised in the Data Breach.

60.    By failing to timely disclose the Data Breach, PJ&A prevented victims from taking meaningful and proactive mitigation measures to protect themselves from harm.

61.    Plaintiff is informed and believes that the Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures in order to protect its patients' PII and PHI.

**PJ&A Failed to Comply with FTC Guidelines and Industry Best Practices.**

62.    PJ&A is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act

63.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[32]

64.    In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[33] The guidelines state that:

    a.    Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

    b.    Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

---

[32] *Start with Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last accessed Dec. 11, 2023).
[33] *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission, October 2016, available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed Dec. 11, 2023).

c.     Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d.     Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e.     Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.

65.     In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[34]

66.     Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67.     PJ&A was at all times fully aware of its obligations to protect the PII and PHI of its healthcare provider clients' patients because of its position as a business associate of covered entities, which gave it access to reams of patient PII and PHI. PJ&A was also aware of the significant repercussions that would result from its failure to do so.

68.     Upon information and belief, PJ&A failed to properly implement one or more of the basic data security practices recommended by the FTC. PJ&A's failure to employ reasonable and appropriate data security measures to protect against unauthorized access to patients' PII and/or PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

---

[34] *See Start with Security: A Guide for Business*, Federal Trade Commission, June 2015, available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business. (last accessed Dec. 11, 2023).

69.     Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[35]

70.     NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[36] PJ&A failed to adhere to the NIST guidance.

71.     Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare security, including implementing the following measures:

       a.   Email protection systems and controls;

       b.   Endpoint protection systems;

       c.   Identify all users and audit their access to data, application, systems, and endpoints;

       d.   Data protection and loss prevention measures;

       e.   IT asset management;

       f.   Network management;

       g.   Vulnerability management;

       h.   Security operations center & incident response; and

       i.   Cybersecurity oversight and governance policies, procedures, and processes.[37]

72.     Upon information and belief, Defendant's failure to protect massive amounts of PII is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

73.     PJ&A was well aware of its obligations to use reasonable measures to protect patients' PII and PHI. PJ&A also knew it was a target for hackers, as discussed above. Despite understanding the

---

[35] *See Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (April 16, 2018), Appendix A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last accessed Dec. 11, 2023).
[36] *Id.* at Table 2 pg. 26-43.
[37] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last accessed  Dec. 11, 2023).

risks and consequences of inadequate data security, Defendant nevertheless failed to comply with its data security obligations.

**PJ&A is Obligated Under HIPAA to Safeguard Patient PHI.**

74.    PJ&A is required by HIPAA, 42 U.S.C. § 1302d, *et seq.* to safeguard patient PHI.

75.    As a business associate of healthcare providers, PJ&A is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

76.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

77.    Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

78.    Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either "(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

79.    HIPAA requires PJ&A to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.

80.    HHS further recommends the following data security measures a regulated entity such as PJ&A should implement to protect against some of the more common, and often successful, cyber-attack techniques:

       a.    Regulated entities should implement security awareness and training for all workforce members and that the training programs should be ongoing, and

evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

b.    Regulated entities should implement technologies that examine and verify that received emails do not originate from known malicious site, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

c.    Regulated entities should mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

d.    Regulated entities should implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

e.    Regulated entities should implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[38]

81.    Upon information and belief, PJ&A failed to implement one or more of the recommended data security measures.

82.    While HIPAA permits healthcare providers and their business associates to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals, nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

83.    As such, Defendant is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it acquires, receives, and collects, and Defendant is further

---

[38] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. Dept't of Health & Human Services (mar. 17, 2023), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html (last accessed Dec. 11, 2023).

required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

84. Given the application of HIPAA to PJ&A, and that Plaintiff and Class Members directly or indirectly entrusted their PHI to Defendant in order to receive healthcare services from PJ&A's healthcare provider clients, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**Plaintiff's Experience.**

85. Plaintiff is a patient of one of PJ&A's healthcare provider clients. In order to receive healthcare services, Plaintiff was required to provide and entrust her healthcare provider with her PII and PHI. PJ&A provides transcription services for Plaintiff's healthcare provider and received Plaintiff's PII and PHI in connection with those services. In requesting and maintaining Plaintiff's PII and PHI, PJ&A undertook a duty to act reasonably in its handling of Plaintiff's PII and PHI. PJ&A, however, did not take care of Plaintiff's PII and PHI, leading to its exposure as direct result of Defendant's inadequate data security measures.

86. Plaintiff received a notification from Defendant informing her that her PII and PHI she directly and or indirectly provided to PJ&A was compromised in the Data Breach. The letter put the onus on Plaintiff to protect her PII and PHI by encouraging Plaintiff to remain vigilant and recommending that she regularly review her financial accounts, report any suspicious or unrecognized activity immediate, and monitor her accounts for the next 12 to 24 months.

87. Since learning of the Data Breach, Plaintiff has been required to spend her valuable time and efforts to mitigate her risk of future identity theft and fraud, including spending time researching the Data Breach, spending time changing her passwords to her financial and medical accounts, and spending time freezing her credit with the credit bureaus.

88. Since the Data Breach, Plaintiff has also received multiple dark web monitoring alerts from her credit monitoring services, alerting her that her PII and PHI is on the dark web.

89. Plaintiff has suffered actual injury from having her PII and PHI exposed and/or stolen as a result of the Data Breach, including: (1) required mitigation efforts, including needing to monitor her financial and medical accounts to ensure her information is not used for identity theft and fraud; (b) damages to and diminution of the value of her PII, a form of intangible property that loses value when it

falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

90.     In addition, knowing that hackers accessed and likely exfiltrated her PII and PHI and this information is likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

91.     As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a heightened risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

**Plaintiff and Class Members Have Suffered Damages.**

92.     For the reasons mentioned above, PJ&A's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members to suffer significant harm in several ways, including substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

93.     Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of PJ&A's conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

94.     As a result of PJ&A's failures, Plaintiff and Class Members face an increased risk of identity theft, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

95.    With respect to healthcare breaches, another study found "the majority [70 percent] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[39]

96.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[40]

97.    Indeed, PII and PHI are valuable commodities to identity thieves and once they have been compromised, criminals will use them and trade the information on the cyber black market for years thereafter. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account routing numbers can fetch up to $1,200 to $1,300 each on the black market.[41] According to a report released by the FBI's cyber division, criminals can sell healthcare records for 50 times the price of stolen Social Security Numbers or credit card numbers.[42]

98.    The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[43]

99.    Health information, in particular, is likely to be used in detrimental ways, by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[44]

---

[39] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HEALTHITSECURITY, https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud (last accessed Dec. 11, 2023).
[40] *Id.*
[41] Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC Media, (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last accessed Dec. 11, 2023).
[42] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last accessed Dec. 11, 2023).
[43] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH, (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed Dec. 11, 2023).
[44] *Id.*

-21-

100.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[45]

101.    Plaintiff and Class Members are also at a continued risk because their information remains in PJ&A's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as PJ&A fails to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

102.    Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers and their families, friends, and colleagues.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this class action on behalf of herself and all others who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

104.    Plaintiff seeks to represent the following Class of persons defined as follows:

> All individuals in the United States whose PII and/or PHI was compromised in the PJ&A Data Breach which occurred between March 27, 2023, and May 2, 2023 (the "Class").

105.    Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

106.    This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

---

[45] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, EXPERIAN, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accessed Dec. 11, 2023).

107.    **Numerosity:** The members of the Class are so numerous that the joinder of all members is impractical. Plaintiff is informed and believes, and thereon alleges, that there are millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through PJ&A's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 8.9 million individuals.

108.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

        a.    Whether PJ&A had a duty to protect the PII and PHI of Plaintiff and Class Members;

        b.    Whether PJ&A was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

        c.    Whether Plaintiff and Class Members are entitled to damages as a result of PJ&A's wrongful conduct; and

        d.    Whether Plaintiff and Class Members are entitled to restitution as a result of PJ&A's wrongful conduct.

109.    **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

110.    **Adequacy:** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

111.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of

scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

112.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

113.    **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

114.    **Ascertainability:** Class Members are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through PJ&A's books and records.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
#### (Plaintiff on Behalf of the Class)

115.    Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

116.    PJ&A owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and/or PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty including, among other things: (a) designing, maintaining, and testing its security systems to ensure that Plaintiff's and Class Members' PII and/or PHI in PJ&A's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

117.    PJ&A's duty to use reasonable care arose from several sources, including but not limited to those described below.

118.    PJ&A had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate

-24-

security practices on the part of Defendant. By collecting and storing valuable PII/PHI that is routinely targeted by cyber-criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

119.    PJ&A's duty also arose from Defendant's special relationship with its patients as a result of its position as a healthcare provider. PJ&A holds itself out as a trusted business associate of providers of healthcare services, and thereby assumes a duty to reasonably protect patients' information.

120.    PJ&A also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. PJ&A's conduct included its failure to adequately restrict access to its computer networks that held patient PII and PHI.

121.    PJ&A also knew or should have known of the inherent risk in collecting and storing massive amounts of PII and PHI, the importance of implementing adequate data security measures to protect that PII and PHI, and the frequency of cyberattacks such as the Data Breach in the healthcare sector.

122.    Further, PJ&A's duty arose from various statutes requiring Defendant to implement reasonable data security measures, including but not limited to: Section 5 of the FTC Act and HIPAA. For example, Section 5 of the FTC Act required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendant's duty to Plaintiff and the Class. Section 5 of the FTC Act prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect highly sensitive data. Therefore, Defendant was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendant's duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of Section 5 of the FTC Act.

123.    Similarly, HIPAA is a further source of Defendant's duty to Plaintiff and the Class, as HIPAA required PJ&A to take reasonable measures to protect Plaintiff's and the Class's sensitive data. Specifically, HIPAA required PJ&A to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably

anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*. By failing to implement reasonable data security measures, Defendant acted in violation of HIPAA. PJ&A is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of PJ&A's duty are identified above.

124.    PJ&A's violation of Section 5 of the FTC Act and HIPAA, constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff and Class Members belong and to prevent the type of harm that resulted from the Data Breach.

125.    Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its clients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

126.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and/or PHI would not have been compromised.

127.    As a direct and proximate result of PJ&A's negligence, Plaintiff and Class Members have suffered injuries, including: (a) actual identity theft; (b) the loss of the opportunity how their PII and/or PHI is used; (c) the compromise, publication, and/or theft of their PII and/or PHI; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII and/or PHI; (e) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data

Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII and/or PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII and/or PHI in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and/or PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

128.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, damages in an amount to be proven at trial.

<u>**SECOND CAUSE OF ACTION**</u>
**UNJUST ENRICHMENT**
**(Plaintiff on behalf of the Class)**

129.    Plaintiff restates and realleges all preceding allegations set forth above as if fully alleged herein.

130.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by PJ&A and that was ultimately accessed or compromised in the Data Breach.

131.    Plaintiff and Class Members conferred a monetary benefit upon PJ&A in the form of monies paid for healthcare services or other services. PJ&A's business model would not exist save for the need to ensure the security of Plaintiff's and Class Members' PII in order to provide medical transcription services to its healthcare provider clients.

132.    The relationship between PJ&A is not attenuated, as Plaintiff and Class members had a reasonable expectation that the security of their PII and PHI would be maintained when they provided their PII and PHI to Defendant's healthcare provider clients.

133.    PJ&A accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Upon information and belief, this financial benefit was, in part, conferred, when Defendant was paid by clients to use Plaintiff's and Class Members' PII and PHI to provide medical transcription services to PJ&A's healthcare provider clients. Defendant also benefitted from the receipt of Plaintiff's

and Class Members' PII and PHI.

134.    PJ&A also understood and appreciated that the PII and PHI pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of the PII and PHI.

135.    But for PJ&A's willingness to commit to properly and safely collecting and maintaining the security of Plaintiff's and Class Members' PII and PHI, their sensitive information would not have been transferred to and entrusted to PJ&A. Further, if Defendant had disclosed that its data security measures were inadequate, PJ&A would not have gained the trust of its healthcare provider clients.

136.    As a result of PJ&A's wrongful conduct, Plaintiff and Class Members suffered damages in an amount equal to the difference between their payments made with reasonable data security and privacy practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data security and privacy practices and procedures that they received.

137.    PJ&A's enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class Members' PII and PHI, while at the same time failing to securely maintain that information from unauthorized access and compromise.

138.    In particular, PJ&A enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, PJ&A instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

139.    PJ&A should not be permitted to retain the money belonging to Plaintiff and Class Members. It would be unjust, inequitable, and unconscionable to retain the benefits it received and is still receiving from Plaintiff and Class Members because Defendant failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal and state laws and industry standards.

140.    The benefit conferred upon, received, and enjoyed by PJ&A was not conferred gratuitously, and it would be inequitable and unjust for PJ&A to retain the benefit.

141.    Plaintiff and Class Members are without an adequate remedy at law.

142.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services, or Defendant should be compelled to place a percentage of all future profits into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, designed to represent the value obtained by the use of the inadequately secured PII and/or PHI compromised as a result of the Data Breach.

### THIRD CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (Plaintiff on behalf of the Class)

143.    Plaintiff restates and realleges all preceding allegations set forth above as if fully alleged herein.

144.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et. seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

145.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether PJ&A is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and PHI and remains at imminent risk that further compromises of her PII and/or PHI will occur in the future.

146.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a.    PJ&A owed a legal duty to secure patients' PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and

b.    PJ&A breached and continues to breach this legal duty by failing to employ reasonable measures to secure patients' PII and PHI.

147.   This Court also should issue corresponding prospective injunctive relief requiring PJ&A to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' PII and PHI.

148.   If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at PJ&A. The risk of another such breach is real, immediate, and substantial. If another breach at PJ&A occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

149.   The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to PJ&A if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to PJ&A of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and PJ&A has a pre-existing legal obligation to employ such measures.

150.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at PJ&A, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

## **DEMAND FOR JURY TRIAL**

Please take notice that Plaintiff demands a trial by jury as to all issues so triable in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all other similarly situated, pray for relief as follows:

1.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

2.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

3.   For compensatory damages on behalf of Plaintiff and the Class;

4.   For punitive damages on behalf of Plaintiff and the Class;

5.   For an order of restitution and all other forms of equitable monetary relief;

-30-

6.    Declaratory and injunctive relief as described herein;

7.    For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

8.    Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

9.    Awarding pre- and post-judgment interest on any amounts awarded;

10.    For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

11.    Awarding such other and further relief as may be just and proper.

Dated this 4th day of January, 2024.

THE BOURASSA LAW GROUP

*/s/   Jennifer A. Fornetti*
MARK J. BOURASSA, ESQ. (NBN 7999)
JENNIFER A. FORNETTI, ESQ. (NBN 7644)
VALERIE S. GRAY, ESQ. (NBN 14716)
2350 W. Charleston Blvd., Suite 100
Las Vegas, Nevada 89102

Gary F. Lynch (*pro hac vice forthcoming*)
Jamisen A. Etzel (*pro hac vice forthcoming*)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222

*Attorneys for Plaintiff and Proposed Class*